**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | CASE NO. 24-cr-346 (TJK) |
| | : | |
| v. | : | |
| | : | **VIOLATIONS:** |
| **GABRIEL ROBIN,** | : | |
| | : | **40 U.S.C. § 5104(e)(2)(D)** |
| Defendant. | : | **(Disorderly Conduct in** |
| | : | **a Capitol Building)** |
| | : | |
| | : | **40 U.S.C. § 5104(e)(2)(G)** |
| | : | **(Parading, Demonstrating, or Picketing in** |
| | : | **a Capitol Building)** |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Gabriel Robin has pleaded guilty to two second degree misdemeanors in violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count One) and 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Two). For the reasons set forth herein, the government requests that this Court sentence Robin to 21 days' incarceration on Count One and 36 months' probation on Count Two. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.[1]

---

[1] Robin traveled through the Capitol with Brandon Barnhill. *See United States v. Brandon Barnhill,* 24-cr-402 (TNM). The Court scheduled Barnhill's plea and sentencing hearing for December 5, 2024. The government recommended an identical sentence for Barnhill.

1

I.     **Introduction**

Robin, a 28-year-old shop foreman, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[2]

Robin pleaded guilty to violations of 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). The government's recommendation is supported by Robin's decision to enter the Capitol after observing the chaotic scene on the Capitol's West Front. When Robin arrived on Capitol grounds, he described seeing "antagonists" in the crowd fighting with Capitol police. Robin also felt the effects of chemical irritants in the air and used water bottles he found at the Capitol to, "wash his eyes out." Despite indications around him of the developing riot, Robin did not leave Capitol grounds. Instead, he climbed to the Upper West Terrace and entered the Capitol through the Upper West Terrace door at 2:45 p.m. Robin entered the Capitol with a megaphone and smoked a substance in the East Foyer before leaving the Capitol through the East Rotunda Doors at 2:53 p.m. After spending approximately 8 minutes inside the Capitol, Robin remained on Capitol grounds and spent over two hours at the Capitol during the January 6 riot. During a

---

[2] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

subsequent interview with the FBI on May 29, 2024, Robin lied to the FBI by falsely reporting that the United States Capitol Police were holding the doors to the Capitol open and allowed Robin to enter. As part of his plea, Robin acknowledged this statement was false.

The Court must also consider that Robin's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Robin's crime support a sentence of 21 days' incarceration and 36 months' probation in this case.

I.      **Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 16

*Robin's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Robin traveled from Louisiana to Washington D.C. to attend the then-president's rally. After attending the rally, Robin traveled with the crowd to the United States Capitol. (*Image 1*)



*Image 1: Robin traveling to the Capitol following then- president's rally.*

At approximately 2:30 p.m., Robin arrived on the Capitol's West Front. At this location, Robin participated and observed the developing riot, including violence by rioters against police officers. (*Image 2*). Although he was not directly sprayed by police officers, Robin felt the overwhelming effects of chemical irritants in the air that police officers deployed to quell the riot.



*Image 2: Robin on the West Front where he observed the actions of other rioters.*

From there, Robin made his way to the Upper West Terrace. Once on the Upper West Terrace, Robin traveled to the Upper West Terrace Door at the center of the Capitol. Robin entered the Capitol through this entryway at approximately 2:45 p.m., nearly one minute before officers

4

physically prevented rioters from entering the Capitol at this location. *(Image 3)*. Contrary to Robin's statement to the FBI on May 24, 2024, that U.S. Capitol Police held this door open for Robin and other rioters and thereby permitted their entry into the Capitol, no authorized person, including police officers, held these doors open nor permitted Robin to enter the Capitol by any other means. Robin acknowledges that this statement to the FBI was false.



*Image 3: Robin entering the Capitol with a megaphone in his hand.*

After Robin entered the Capitol through the Upper West Terrace Door, Robin walked through a hallway and up a set of stairs leading to the Capitol Rotunda at approximately 2:46 p.m. Once Robin reached the Rotunda, he remained in the Rotunda for several minutes carrying a megaphone and cell phone recording and taking photos of the scene around him. *(Image 4)*.



*Image 4: Robin in the Capitol Rotunda holding a megaphone.*

At approximately 2:47 p.m., Robin entered the East Foyer. He briefly traveled back to the Rotunda on two instances after entering the East Foyer, each time returning to the East Foyer. Additionally, while in the East Foyer, Robin smoked a substance. (*Image 5*).



*Image 5: Robin smoking in the East Foyer.*

Shortly thereafter, at approximately 2:53 p.m., Robin departed the Capitol through the East Doors. However, Robin remained on Capitol grounds, and, in total, spent over two hours on Capitol grounds during the riot on January 6, 2021.

*Robin's Interview*

In two pre-arrest interviews on May 19, 2021 and May 24, 2024, Robin spoke with the FBI about his actions on January 6, 2021. During these interviews, Robin stated that he "moved with the crowd" to the Capitol following the rally. After arriving on the West Front at approximately 2:30 p.m., Robin recalled observing "antagonists in the crowd." Robin also describing being "hit with pepper gas by the police, but just from the wind not from a direct hit."

Robin stated that once he was near the Capitol, officers with the United States Capitol Police, "opened the barricades" and "unexpectedly waved the crowd inside and he found himself moving with the crowd up a set of stairs." During this time Robin acknowledged witnessing fighting with the Capitol police and using a water bottle to rinse his eyes from the effects of pepper

6

spray. As he entered the building, Robin stated the police were "holding the doors open" as he walked in the Capitol. Robin told the FBI he thought he remained in the Capitol for "3 minutes." As part of his plea agreement, Robin acknowledged that these representations to the FBI were false.

*The Charges and Plea Agreement*

On June 10, 2024, the United States charged Robin by a two-count Information with violating 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). On August 26, 2024, pursuant to a plea agreement, Robin pleaded guilty to both counts of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Robin agreed to pay $500 in restitution to the Architect of the Capitol.

## II.  Statutory Penalties

Robin now faces a sentencing for violating 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). On each count, Robin faces up to six months of imprisonment and a fine of up to $5,000. Robin must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## III.  Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 21 days' incarceration and 36 months' probation.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Robin's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Robin, the absence of violent or destructive acts is not a mitigating factor. Had Robin engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Robin's case is his decision to advance and enter the Capitol after observing the chaos around him, including rioters fighting with police officers and being impacted by pepper spray. Despite these unmistakable signals to leave, Robin stayed on Capitol grounds. He was a participant in the riot and observed rioters overrun the Capitol as the mob climbed scaffolding from the West Front to the Lower and Upper West Terraces. After he entered the Capitol with a megaphone, he roamed around the Capitol, near the Rotunda and East Foyer, relishing in the mob's actions inside the Capitol as he recorded the riot on his cell phone. Robin proceeded to smoke a substance inside the Capitol before leaving. Once he left the Capitol, he remained on Capitol grounds, spending roughly 2 hours at the Capitol during the riot. During a subsequent interview with the FBI, he falsely stated police officers let him enter the building in an attempt to mitigate his actions.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Robin's History and Characteristics

Robin is a 28-year-old shop foreman and a lifelong resident of Louisiana. PSR ¶ 34, 41. Robin reports a stable lifestyle and strong familial support system. PSR ¶ 32 – 34. Robin is a father to a 3-year-old child. PSR ¶ 32 – 34. Robin does not suffer from mental health or substance abuse issues and has maintained steady employment in the automotive industry. PSR ¶ 41 – 47. While Robin has no criminal history, PSR ¶ 24, 25, there is nothing in his background that would explain why he committed these crimes on January 6. In these circumstances the absence of a criminal background does not lessen Robin's potential to commit this type of offense again, should similar circumstances present themselves.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Robin's case presents several aggravating factors worthy of incarceration. This Court should fashion an appropriate sentence, accordingly.

As Robin arrived on Capitol grounds, the actions of the mob offered obvious indications that he should have left. He did not. He observed the chaos and aggression by rioters against officers. He felt the chemical irritants in the air and required water to wash out his eyes. He saw rioters climbing scaffolding to reach the various terraces on the west side of the Capitol as the mob advanced on the Capitol. He joined this advance and entered through the Upper West Terrace Doors with a megaphone.

Robin had no authority to enter the Capitol. Yet, he told the FBI that officers "opened barricades" and held open the Upper West Terrace door open as he entered the Capitol. These statements were false, and Robin knew they were false. No police office allowed Robin to enter the building. On his own volition, he moved through the building carrying a megaphone, knowing

10

he had no authority to enter. He moved around the Rotunda observing the ongoing melee. After entering the East Foyer, Robin smoked a substance in the East Foyer, indicative of the brazenness of his actions and disrespect for the Capitol. After he left the Capitol, he did not leave. The Court must sentence Robin in a manner sufficient to deter him specifically, and others generally, from participating in political rioting again.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[3] This Court must sentence Robin based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Robin has pleaded guilty to violations of 40 U.S.C. § 5104(e)(2)(D) (Count One) and parading, demonstrating, or picketing in any Capitol building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Two). These offenses are Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Michael McCormick*, 21-cr-710, Judge Chutkan sentenced the defendant to 14 days' incarceration for similar conduct. While McCormick pled guilty to 18 U.S.C. § 1752(a)(1), McCormick, like Robin, approached the Capitol despite observing police protecting the building and "tear gas chocking the air." Both defendants were not deterred by what they observed. McCormick traveled to the Upper West Terrace and entered the Capitol at 2:55 p.m., approximately 8 minutes after Robin entered the Capitol through an adjacent entrance on the Upper West Terrace.  McCormick and Robin remained in the Capitol for approximately 8 minutes and recorded their actions, and those of other rioters, on their phones. Robin and McCormick also attempted to deceive the FBI during their respective investigations. McCormick deleted pictures he took on January 6 from his phone after the FBI contacted him. Robin was not forthright with the FBI when discussing his initial entrance into the Capitol. Robin warrants a similar sentence, consistent with our recommendation.

Another case that offers similar facts for this Court's consideration is *United States v. Ruben Reyna*, 23-cr-350 (CKK). While Reyna also entered a guilty plea on one count of 18 U.S.C. § 1752(a)(1), Reyna, like Robin, arrived at the Capitol on the West Front. Both defendants described the chaotic and deteriorating scene they observed during interviews with the FBI. As Reyna approached the building, he described a "threshold that should not be crossed." As Robin stood with the mob on the West Front, he observed "antagonists" and fighting between rioters and

officers. Yet, both defendants did not heed these warning and leave – they continued to advance. Both Reyna and Robin entered the Capitol with a friend. While Reyna climbed through a window along the senate wing, he did not move deeper into the building after he entered. He left the building after approximately one minute and remained on the Upper West Terrace for approximately 10 minutes thereafter. To the contrary, Robin continued to move through the building and into the Rotunda before leaving through the East Rotunda Doors. Reyna and Robin both submitted to subsequent interviews with the FBI where both defendants offered misleading narratives for their initial entry into the Capitol. Judge Kollar-Kotelly sentenced Reyna to the government's recommendation of 14 days' incarceration and 12 months' probation. ECF 25 (Sentencing Memorandum), 34 (Judgment).

*United States v. Leticia Ferreira*, 22-cr-210, offers the Court another comparator where Judge Chutkan imposed a 14-day carceral sentence following a plea to 40 U.S.C. § 5104(e)(2)(G) for a defendant who was undeterred by tear gas after the defendant observed the angry mob at the Capitol. Ferreira spent approximately 45 minutes in the Capitol after observing officers deploy tear gas against the mob. While Robin spent approximately 8 minutes in the Capitol, he remained on Capitol grounds for over two hours. Also, Ferreira, like Robin, was not entirely truthful about her participation in the riot when interviewed by the FBI.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its

13

own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## IV.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[4] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Robin must pay $500 in restitution, which reflects in part the

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

role Robin played in the riot on January 6.[5] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Robin's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 56, 71.

### V.     Fine

Robin's convictions for violations of 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G) subject him to a statutory maximum fine of $10,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

### VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Robin to 21 days' incarceration on Count One and 36 months' probation on Count Two. The government also requests that this Court

---

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution. Such a sentence promotes respect for the law and deters future crime by imposing restrictions on Robin's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

                Respectfully submitted,

                MATTHEW M. GRAVES
                United States Attorney
                D.C. Bar No. 481052

BY:   */s/ Eli J. Ross*
       Eli Ross
       Assistant United States Attorney
       Bar No. IL 6321411
       U.S. Attorney's Office for the District of Columbia
       601 D Street, N.W.
       Washington, D.C. 20530
       Phone: (202) 297-1515
       Email: Eli.Ross@usdoj.gov