UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CASE NO.: |
| VERSUS | * | 1:24-cr-00346-TJK |
| GABRIEL ROBIN | * | |

## DEFENDANT'S SENTENCING MEMORANDUM

NOW INTO COURT, through undersigned counsel, comes the defendant, Gabriel Robin, who respectfully submits this memorandum in anticipation of his sentencing hearing before this Honorable Court on December 16, 2024.

### Introduction

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). "Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487 (2011) (quotation marks and citation omitted). To that end, sentencing judges are required to conduct individualized assessments and consider all the § 3553(a) factors to determine a sentence that will achieve the statutory sentencing goals of just punishment, deterrence, public protection, and rehabilitation for the specific person being sentenced. See *Gall v. United States*, 552 U.S. 38, 50 (2007).

1

The Supreme Court has acknowledged in a line of cases including, *Rita v. United States*, 551 U.S. 338 (2007), *Spears v. United States*, 555 U.S. 261 (2009) and *Nelson v. United States*, 555 U.S. 350 (2009), all decided since *Booker*, that district courts have wide latitude in using their discretion, even when it is in conflict with the Sentencing Guidelines or policy statement of the U.S. Sentencing Commission, to achieve the statutory purposes of 18 U.S.C. § 3553(a).

In this case, Mr. Robin pled guilty to two Class B misdemeanors, both of which carry a maximum term of imprisonment of six-months. However, Mr. Robin respectfully avers that the § 3553(a) sentencing factors support a non-incarceration sentence in this case. As such, Mr. Robin requests that the Court impose a sentence of two (2) years' probation, to include community service, for the reasons discussed herein.

## Procedural History

On June 11, 2024, Gabriel Robin was arrested in New Orleans, Louisiana for his participation in the insurrection at the United States Capitol on January 6, 2021. See R. Doc. 5. He made his initial appearance on a complaint before the duty magistrate in the Eastern District of Louisiana and was released on bond subject to pretrial supervision. See R. Doc. 6. On June 25, 2024, Mr. Robin made his first appearance in the District of Columbia before Magistrate Judge Robin B. Merriweather. He was allowed to remain on bond, subject to the additional condition that he surrender his passport to United States Probation. See R. Doc. 8. Mr. Robin has remained on bond without issue since that date.

On July 31, 2024, Mr. Robin was named in a two-count bill of information filed by the United States Attorney's Office in the District of Columbia charging him with: Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 § U.S.C. 5104(e)(2)(G). See R. Doc. 12. On August 26, 2024, Mr. Robin pled guilty as charged. See R. Docs. 15-17. Sentencing is scheduled before this Honorable Court on December 16, 2024.

## I.    Application of the Sentencing Factors

The primary directive in § 3553(a) is that the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with" the purposes of sentencing. *See* 18 U.S.C. § 3553(a) (emphasis added). Honest application of the federal sentencing statute confirms that a sentence of probation to include community service is sufficient but not greater than necessary to meet the goals of sentencing, for the reasons discussed herein.

### A.  History and Characteristics of Mr. Robin

Mr. Robin was born in New Orleans, Louisiana, on October 23, 1996, to the marital union of Charles Robin, III and Lisa Robin. Mr. Robin remembers his childhood fondly— his parents worked hard to provide for their three children and to maintain a close knit-family unit. Mr. Robin's father owns and operates a commercial shrimping business, and his mother manages the finances. Mr. Robin had to look no further than his own parents to find an example of a healthy, supportive partnership. He does not remember ever seeing them argue, and the couple have been happily married for over 44 years. Mr. Robin's

family ate meals together every night and went to Mass every Sunday morning. He maintains close relationships with his parents and his two older brothers to this day—both of whom went on to start their own commercial fishing businesses in Louisiana. Mr. Robin, as the baby of the family, lived primarily with his parents in St. Bernard Parish, Louisiana until he was twenty-five.

In November of 2021, Mr. Robin and his fiancé, Natalie Sterling, purchased a home together in Violet, Louisiana. The couple has been together for eight years. Ms. Sterling works full-time as a hospital technician and is currently enrolled in nursing school. They share one child together—a son, Rowan Robin, who is now three years old and who idolizes his father, for good reason. Mr. Robin is by all accounts an active and dedicated parent and partner. He cooks, cleans, and handles daycare drop off for Rowan, in addition to working a full-time job at the auto-mechanic shop so that Ms. Sterling can continue her education.

Mr. Robin has been steadily employed since graduating from Chalmette High School in 2016. He has worked in a variety of roles, as an: HVAC technician, car detailer, auto technician, and he is now a shop foreman at Mikey's Truck Stop in Slidell, where he has been employed since 2019. Mr. Robin's work history shows dedication and ambition— he only ever leaves a position to take advantage of a better one. See PSR ¶'s 41-45. At present, he has been working long hours at the truck stop to financially support his growing family and to save enough money to pay restitution on the day of sentencing. Despite his long list of responsibilities, Mr. Robin still finds time to remain involved in his local church

and volunteer on behalf of the Los Islenos Society, which is dedicated to preserving the cultural heritage of Canary Island descendants, and the Louisiana Crawfish Foundation, which works to support community programs in the St. Bernard Parish area.

His cousin, Francisco Gonzalez, describes Mr. Robin as a man whose "life has been marked by dedication, hard work, and an unwavering commitment to his family and community." See Def. Ex. A. Neither Mr. Robin nor his family would have imagined he would be pending sentencing in federal court. Nor could they have predicted that he would have traveled to Washington D.C. to participate in the Capitol insurrection in January 2021. Indeed, he has never been charged, much less convicted, for any crimes of violence or recklessness in the past. In fact, he has no criminal history whatsoever. There is nothing in Mr. Robin's background that would indicate the instant offense is part of an escalating pattern of criminal conduct nor the inception of one. Indeed, Mr. Robin's conduct on January 6, 2021, seems to be an aberration from an otherwise lawful and productive life, as the appended letters attest. See Def. Ex. A.

**B.  Nature and Circumstances of the Offense**

Mr. Robin traveled to Washington, D.C. for January 6th because President Trump encouraged American citizens to do so. The President of the United States, the Commander-in-Chief, and the most recognizable figure in government stood behind the seal and told the electorate that the election was going to be stolen if they did not act. He stated without equivocation that the will of the American people in choosing their next President had been subverted and that the future of the republic hung in the balance. Of

course, none of this was true. However, for citizens like Mr. Robin, who got his news primarily from social media, it was a shocking revelation. Mr. Robin sincerely believed that the very foundation of our democracy, the right to self-determination, was in jeopardy due to Congress' decision to certify the election in favor of a candidate that, according to what he was told, did not win it.

As such, Mr. Robin traveled to Washington to attend the Stop the Steal rally on January 6, 2021. He was invited by his employer in Louisiana—who paid for his airfare. See Def. Ex. A (letter from Rhonda Serpas). At the time, he thought that his attendance would be a patriotic act. Unfortunately, Mr. Robin's actions on January 6th threatened the very democracy he sought to protect. He now recognizes that his actions that day were not only unpatriotic, but they were also criminal. Bad information causes good people to do bad things, and Mr. Robin's decision to act on the bad information he received permanently changed the trajectory of his life—regardless of the formal sentence imposed by this Court.

On January 5, 2021, Mr. Robin traveled from Louisiana to Washington D.C. He spent the night in a hotel and in the morning walked to the Ellipse to listen to President Trump's speech at the Stop the Steal rally. President Trump, after several minutes of reiterating his claims that the election was stolen, said the following to the crowd (including Mr. Robin):

> We will not let them silence your voices. We're not going to let it happen, I'm not going to let it happen…..We're gathered together in the heart of our nation's capital for one very, very basic and simple reason – to save our democracy….Now, it is up to Congress to confront this egregious assault on our democracy. And after this, ***we're going to walk down, and I'll be there***

***with you***, we're going to walk down…I know that everyone here will soon be marching over to the *Capitol building* to peacefully and patriotically make your voices heard….And they want to recertify their votes…**But the only way that can happen is if Mike Pence agrees to send it back…If not…you will have an illegitimate President.** That's what you'll have. And we can't let that happen…**We must stop the steal** and then we must ensure that such outrageous election fraud never happens again….**And we fight. We fight like hell**. **And if you don't fight like hell, you're not going to have a country anymore…..So we're going to, we're going to walk down Pennsylvania Avenue…And we're going to the Capitol, and we're going to try and give them the kind of pride and boldness that they need to take back our country.. So, let's walk down Pennsylvania Ave**.[1]

Mr. Robin joined the throngs of people walking towards the Capitol after President Trump's speech. He arrived on the Capitol's West Front and observed the rioting that had already ensued. Mr. Robin made his way through the entryway located at the Upper West Terrace—only one minute prior to Capitol police physically blocking off the entrance. He walked up stairs leading to the Capitol Rotunda and took photos with his phone, hit his vape pen, and then exited through the East Doors. Mr. Robin was inside the Capitol for a total of seven minutes.

However, it is important to note that despite the violence of the crowd, Mr. Robin did not engage in violent conduct as an individual. Mr. Robin was not armed. He did not directly assault nor batter any members of law enforcement. He did not wrench any weapon from an officer, beat an officer with a flagpole, or spray an officer with bear spray or any

---

[1] Associated Press, *Transcript of Trump's Speech at Rally Before US Capitol Riot*, U.S. News & World Report, Jan. 13, 2021, available at: https://www.usnews.com/news/politics/articles/2021- 01-13/transcript-of-trumps-speech-at-rally-before-us-capitol-riot (emphases added).

other irritant. He did not personally push any member of the Capitol Police, move any barricades, or otherwise instigate any crowd violence. Instead, he formed a part of the crowd that eventually pushed into the Rotunda.  But once inside for no more than a few minutes, Mr. Robin was ordered to leave by the Capitol police, and he did so without hesitation. Indeed, Mr. Robin did not come to Washington, D.C. on January 6, 2021, with the intent to engage in any violent activity, nor to enter the Capitol at all.

As Mr. Robin will admit without equivocation, his actions on January 6, 2021, were reckless, dangerous, and illegal. The symbolic impact of the insurrection will echo throughout future generations, and the events that transpired at the Capitol will forever mark January 6th as one of America's darkest days. Mr. Robin was complicit in this causing this irreparable damage. He will have to bear the weight of that complicity for the rest of his life. Mr. Robin knows and accepts that he was wrong, in both thought and action, and he is prepared to suffer the consequences that have and will continue to flow as a result.

However, in comparison to others at the Capitol that day, Mr. Robin's actual conduct does not warrant a period of incarceration. He has been punished and will be punished still regardless of the Court's sentence. Moreover, by all accounts, his involvement in the insurrection was inconsistent with his character. He had never been violent or reckless in such a manner previously. The disconnect between who Mr. Robin is and the crime he participated in is admittedly difficult to reconcile.

The Honorable Amit P. Mehta alluded to this issue in a sentencing hearing encouraging us all to ask ourselves why ordinary American citizens from all over the country

with good backgrounds and steady jobs came together to commit these acts. *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at 26-28. Judge Mehta opined that this was able to occur because of:

> [T]he power of propaganda; the power of being told lies over and over again; told by leaders who knew better, that something was taken away from people when it wasn't…The idea that people who have otherwise led modest and humble lives, who have not been political agitators, political activists, are now facing serious jail time is extraordinary.

*Id*.

Mr. Robin's aberrant conduct on January 6th is yet another example of the "power of propaganda" alluded to by Judge Mehta. Indeed, bad information causes good people to do bad things.

### C. The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.

Despite the government's contention, punishment can be levied and suffered in a myriad of ways. Unfortunately, in federal criminal system, "punishment" and "imprisonment" are often used interchangeably. The reality is Mr. Robin's punishment has already begun and will continue long after his formal sentence is completed. The consequences of his conduct and conviction will follow him and his young family for the rest of his life.

However, Mr. Robin accepted responsibility for his actions despite the knowledge that he would suffer both direct and collateral consequences because of his convictions, including bearing the stigma of having been involved in the Capitol riot. See https://www.youtube.com/watch?v=JEGi30N66s8. He did so quickly and without

9

unnecessarily contesting the facts of the case. Mr. Robin's quick acceptance of responsibility shows respect for the law. His lack of misconduct prior to January 6, 2021, evinces his respect for the law, as does his lack of misconduct since January 6, 2021. Attending every Court date and meeting with undersigned counsel indicates not just a respect for the law, but rediscovered trust in the institution itself—something he did not have on January 6, 2021.

Finally, Mr. Robin's respect for the law will be apparent at the sentencing hearing in this case. His regret is evident, his remorse is sincere, and the lessons he has learned have been both difficult and worthwhile. A two-year probationary sentence would serve as just punishment for his actual misconduct and given its duration and the associated deprivation of liberty, promote respect for the law among members of the public who may be considering engaging in similar behavior in the future. Both specific and general deterrence can be achieved by such a non-incarceration sentence in this case, and therefore we urge the Court to consider it.

### D.  The Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) instructs the Court to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." Because of the unprecedented nature of the events on January 6, 2021, the only similarly situated defendants available for comparison here are individuals who were also charged for their involvement in the Capitol insurrection. Therefore, the

defendant, the government, and this Honorable Court are primarily restricted to intra-crime comparisons in the application of the § 3553(a)(6) factor here.

As has been done consistently in January 6th sentencing memoranda, the government has submitted cases in which similarly charged January 6th defendants received more severe sentences, to include terms of imprisonment. Undersigned counsel follows suit here by submitting the following cases in which similarly charged January 6th defendants received non-incarceration sentences.[2] However, while intra-crime comparisons may marginally serve the purposes of § 3553(a)(6), the limitations of said analysis in this unique context are self-evident. There is no sentencing data that undersigned counsel could locate for defendants convicted of violating 40 U.S.C. § 5104 outside of the January 6th context—which creates the risk of a categorical, intra-crime sentencing determination, rather than an individualized one.

The defendant avers that an individualized sentencing is crucial in all cases, as it maintains the balance of justice, fairness, and effectiveness—protecting both criminal defendants and the integrity of the judicial system itself. Therefore, sentencing Mr. Robin based upon the sentences received by other similarly charged January 6th defendants would deprive him of his right to an individualized application of the § 3553(a) factors to his specific case. Indeed, § 3553(a)(6) instructs Courts to consider the need to avoid

---

[2] See *United States v. Brittiany Dillon,* 1:21-CR-00360-DLF; *United States v. Jordan Stotts*, 1:21-CR-00272-TJK; *United States v. Kevin Strong*, 1:32-CR-00114-TJK, *United States v. Michael Carico*, 1:21-CR-00696-TJK; *United States v. Gabriel Burress*, 1:21-CR-00744-TJK, *United States v. Michael Hardin*, 1:21-CR-00280-TJK; *United States v. Robert Snow*, 1:22-CR-00030-TJK; *United States v. Walter Messer*, 1:21-CR-00631-TJK.

"unwarranted" sentencing disparities—not to strive for uniformity for its own sake. Moreover, the government's continued request for consonance in January 6th sentencings may arguably serve to accomplish the goals of § 3553(a)(6), but more often serve to undermine the goals of the remaining sentencing factors, all of which merit equal consideration by the Court. Therefore, the defendant respectfully requests that this Court fashion a sentence that is specifically tailored to Mr. Robin, considering his background and the nature of his actual conduct on January 6th, all of which merit a non-incarceration sentence here.

### E.  The Kinds of Sentences Available

In determining an appropriate sentence, § 3553(a)(3) directs the Court to consider all "the kinds of sentences available." Here, Mr. Robin pled guilty to two Class B misdemeanors, each punishable by up to six-months imprisonment. The sentencing guidelines do not apply to Class B or C misdemeanors, and therefore the Court is limited only by the bounds of 40 U.S.C. § 5104. See PSR ¶ 55. Under the statutes of conviction, Mr. Robin is eligible for and should receive a sentence of probation.

Given the conditions available, a sentence of probation makes for a "substantial restriction of freedom." *See Gall v. United States*, 552 U.S. 38, 48 (2007). Conditions like community confinement or home detention may be imposed. The condition of "intermittent confinement" may also be imposed. *See* 18 U.S.C. § 3563(b)(10); *see also* U.S.S.G. § 5F1.8. A condition of community service should be considered, and numerous other conditions will also attach. These conditions are "reasonably related to the sentencing factors

set forth in [§ 3553(a)]." They "involve no greater deprivation of liberty tha[n] is reasonably necessary for the purposes set forth in [§ 3553(a)(2)]." PSR ¶ 62. Such sentencing options should not be taken lightly and must factor into the Court's sentencing calculus. They do not undermine the law; but instead, are contemplated by it. They will minimize Mr. Robin's risk of recidivism and maximize the public's safety. All the while, they will ensure that he returns to the lawful path he walked prior to the instant offense, for his own sake as well as his family's.

## CONCLUSION

For the foregoing reasons, and others that will be presented at the sentencing hearing, the defense respectfully requests that the Court impose a sentence of two (2) years' probation with significant community service.

Respectfully submitted,

CLAUDE J. KELLY
Federal Public Defender

/s/Warner B. Thompson
WARNER B. THOMPSON
Asst. Federal Public Defender
Hale Boggs Federal Building,
500 Poydras Street, Room 318
New Orleans, Louisiana 70130
Telephone: (504) 589-7932
E-mail: Warner_Thompson@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 26, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following: Asst. United States Attorney Eli Ross, 555 4th Street NW, Washington, DC 20001. I further certify that I emailed the foregoing document and the notice of electronic filing by email to the following non-CM/ECF participants: N/A.

<u>/s/ Warner B. Thompson</u>
WARNER B. THOMPSON
Asst. Federal Public Defender